Dwayne **THRONEBERRY**, Appellant,

v.

**MISSOURI STATE HIGHWAY PATROL, et al.,**
**Respondents.**

**WD 79995**

Missouri Court of Appeals,
Western District.

OPINION FILED: May 16, 2017

Motion for Rehearing and/or Transfer to Supreme Court Denied June 29, 2017

Kenneth McClain and Nichelle L. Oxley, Independence, MO, for appellant.

Diane Peters and Lynette Nefertiti Lockhart, Kansas City, MO, for respondent.

Before Division Three: Anthony Rex Gabbert, Presiding Judge, Victor C. Howard, Judge and Cynthia L. Martin, Judge

Cynthia L. Martin, Judge

Dwayne Throneberry ("Throneberry") appeals from the trial court's entry of summary judgment in favor of the Missouri State Highway Patrol ("MSHP") and Trooper Dustin Lyle ("Trooper Lyle") (collectively "the Defendants"). Throneberry argues that the trial court erred because, as a matter of law, Trooper Lyle's actions during a police pursuit were the proximate cause of a collision that killed Throneberry's sister. Throneberry also argues that the trial court erred because there was a

genuine issue of material fact in dispute regarding Trooper Lyle's state of mind which prevented the entry of summary judgment on Throneberry's recklessness claim against both Defendants. We affirm.

## Factual and Procedural Background

At approximately 1:00 p.m. on August 13, 2012, Trooper Matthew Yoder ("Trooper Yoder") was informed via radio that a suspect was stealing vehicles in the St. Joseph, Missouri area. Trooper Yoder positioned his patrol car on Interstate 29 to intercept the suspect's vehicle if it proceeded southbound on the interstate. At approximately 2:14 p.m., Trooper Yoder was notified that the suspect had stolen a maroon sports utility vehicle ("SUV"). Shortly thereafter, Trooper Yoder observed a maroon SUV traveling southbound at a high rate of speed and passing vehicles on the right shoulder. Trooper Yoder initiated a pursuit of the maroon SUV at 2:17 p.m. When the suspect entered a rest area at a high rate of speed, Trooper Yoder terminated the pursuit at 2:18 p.m., and deactivated his patrol car's emergency lights and siren.

The suspect drove through the rest area and merged onto southbound Interstate 29. Trooper Yoder reentered the interstate and reactivated his patrol car's emergency lights and siren. He was required to travel at a high rate of speed to catch up to the suspect's vehicle. As soon as the emergency lights and siren were within sight and hearing distance of the maroon SUV driven by the suspect, the suspect started swerving through traffic and driving aggressively. Trooper Yoder again deactivated his emergency lights and siren, and pulled off on the right shoulder of Interstate 29. The suspect continued traveling southbound on the interstate, and Trooper Yoder lost sight of the maroon SUV.

Shortly thereafter, the suspect drove to a gas station near Platte City, Missouri on Highway 92, where he carjacked a person using a pellet gun. The suspect fled in a white Buick, and was seen driving toward Leavenworth, Kansas on Highway 92. Sometime later, the Platte County Sheriff's Department reported that the suspect had invaded a home located five miles south of Beverly, Missouri, and had confronted the homeowner with a knife. Trooper Lyle was stopped on 45 Highway and observed a white Buick traveling down a private drive from the address where the home invasion occurred. The suspect was observed turning north onto Highway 45 from the private drive.

Using radar equipment, Trooper Lyle observed the suspect rapidly accelerate to seventy-five miles per hour. Trooper Lyle turned his patrol car around, caught up to the suspect's car, and then activated his emergency lights and siren. Trooper Lyle's pursuit of the suspect began at 2:46 p.m. The suspect and Trooper Lyle continued northbound on Highway 45 until the suspect turned east on Highway 92. While traveling on Highway 92, the suspect reached a top speed of approximately ninety-one miles per hour, and the suspect's car crossed the center line. As the suspect and Trooper Lyle reached the crest of a hill, Trooper Lyle saw another vehicle traveling west in the eastbound lane of Highway 92. The suspect swerved to the right shoulder to avoid the other vehicle. The suspect's car then struck an embankment before returning to the highway and crossing the center line. The suspect's car struck a vehicle driven by Antwinette Holtsclaw ("Holtsclaw") in the westbound lane before coming to rest on the side of the highway. Holtsclaw was pronounced dead at the scene, and the suspect was later pronounced dead at the hospital. Trooper Lyle's pursuit of the suspect last-

ed two minutes over approximately two miles.

Throneberry, as the surviving brother of and plaintiff *ad litem* for Holtsclaw, filed a petition ("Petition") for damages arising from Holtsclaw's death against the Defendants in the circuit court of Jackson County. The Defendants moved for venue to be transferred to Platte County, which was granted. The Petition alleged that "Holtsclaw's death was directly and proximately caused by Defendant Lyle's decision to engage in an unnecessary and dangerous high-speed pursuit despite the fact that his colleague, Trooper Yoder, and [sic] called off his pursuit of the same subject due to safety concerns." The Petition asserted claims of negligence and wrongful death (Count I), negligence *per se* (Count II), and recklessness (Count III) against both Defendants. The Petition further asserted claims of failure to train, instruct, and supervise Trooper Lyle (Count IV), and negligence pursuant to the doctrine of *respondeat superior* (Count V) against MSHP.

The Defendants filed a motion for summary judgment ("Motion") as to all claims set forth in the Petition. The Motion asserted that summary judgment was appropriate because: (1) "The negligent and criminal acts by a third-party driver, not Lyle's actions, were the proximate cause of the accident"; (2) "Defendant Lyle is entitled to official immunity"; (3) "Plaintiff's claims are barred by the public duty doctrine"; (4) "The Missouri State Highway Patrol has sovereign immunity from suit as an agency of the State of Missouri"; and (5) "Plaintiff failed to plead the necessary elements for negligence *per se*." Throneberry opposed the Motion.

Following briefing and oral argument, the trial court sustained the Motion and entered judgment on all counts in favor of the Defendants. The trial court explained:

This Court finds that Defendant Lyle's pursuit is not the proximate cause of the collision between the fleeing suspect's vehicle and the vehicle of the Plaintiff's decedent, and accordingly, summary judgment is granted in favor of Trooper Dustin Lyle for counts I, II, and III. ... [B]ecause there is no proximate cause relationship between the alleged actions of Defendant Lyle and the death of Plaintiffs' [sic] decedent, the MSHP is not liable.... Therefore, summary judgment is granted in favor of Missouri State Highway Patrol on all counts.

Throneberry appeals.

## Standard of Review

Our Supreme Court set forth the standard of review for the grant of summary judgment in *Goerlitz v. City of Maryville*:

The trial court makes its decision to grant summary judgment based on the pleadings, record submitted, and the law; therefore, this Court need not defer to the trial court's determination and reviews the grant of summary judgment *de novo. ITT Commercial Fin. Corp. v. Mid-America Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993); Rule 74.04. In reviewing the decision to grant summary judgment, this Court applies the same criteria as the trial court in determining whether summary judgment was proper. *Id.* Summary judgment is only proper if the moving party establishes that there is no genuine issue as to the material facts and that the movant is entitled to judgment as a matter of law. *Id.* The facts contained in affidavits or otherwise in support of a party's motion are accepted "as true unless contradicted by the non-moving party's response to the summary judgment motion." *Id.* Only genuine disputes as to material facts preclude summary judgment. *Id.* at 378. A material fact in the

context of summary judgment is one from which the right to judgment flows. *Id.*

A defending party ... may establish a right to summary judgment by demonstrating: (1) facts ·negating any one · of the elements of the non-movant's claim; (2) "that the. non-movant, after · an adequate period for discovery, has not been able and will not be able to produce sufficient evidence to allow the trier of fact to find the existence of any one" of the elements of the non-movant's claim; or (3) "that there' is no genuine ·dispute as to the existence of the facts necessary to support movant's properly pleaded affirmative defense." *Id.* at 381. Each of these three methods individually "establishes the right to judgment as a matter of law." *Id.*

333 S.W.3d 450, 452-53 (Mo. banc 2011). In determining whether the moving party has established a basis for summary judgment, we review the record below "in the light most favorable to the party against whom summary judgment was entered, and · that party is entitled to the benefit of all reasonable inferences from the record." *Id.* at 453. Further, "[i]f, as a matter of law, the [trial] court's judgment is sustainable on any theory, it should be affirmed on appeal." *Id.*

## Analysis

Throneberry asserts two points on appeal. Throneberry's first point on appeal argues that the trial court erred in entering summary judgment in favor of the Defendants because Trooper Lyle's pursuit of the suspect was the proximate cause of the collision that killed Holtsclaw, an assertion that, if true, would require reversal of summary judgment on all five counts of the Petition. Throneberry's second point on appeal argues that it was error to enter summary judgment on Count III of the Petition, Throneberry's recklessness claim, because a genuine issue of material fact regarding Trooper Lyle's state of mind prohibited concluding as a matter of law that proximate cause could not be established.

Though Throneberry's inability to establish the essential element of proximate cause was the express basis for the trial court's entry of summary judgment, we "may affirm if the record shows that summary judgment was appropriate either on the basis it was granted by the trial court or on an ·entirely different basis,: if supported by the record." *Brehm v.· Bacon Twp.*, 426 S.W.3d 1, 4 (Mo. banc 2014). The Defendants argue that the trial court's judgment should be affirmed not only on the basis therein' expressed, but also based on application of the official immunity doctrine, the public duty doctrine, and sovereign immunity.

For the reasons herein explained, we conclude that the trial court .did not err in entering summary judgment in favor of the Defendants.

**I. Trooper · Lyle was shielded from liability on Throneberry's claims' for negligence, negligence per se, and recklessness (Counts I, II, and III of the Petition) by the official immunity and public duty doctrines**

"Missouri has long-applied the doctrine of official immunity.". *Southers v. City of Farmington*, 263 S.W.3d 603, 610 (Mo. banc 2008). The official immunity doctrine "protects public employees from liability for alleged acts of negligence committed during the course of their· official duties for the performance of discretionary acts." *Id.* "A finding that a public employee is entitled to official immunity does not preclude a finding that he or she committed a negligent act—because official immunity does not deny the existence of the tort of negligence, but instead provides that an

officer will not be liable for damages caused by his negligence." *Id.* at 611. Thus, "[b]ecause the defense of official immunity is personal to a public employee, it cannot extend to protect his employing governmental entity sued under the doctrine of *respondeat superior.*" *Id.*

"The official immunity doctrine, however, does not provide public employees immunity for torts committed when acting in a ministerial capacity." *Id.* at 610. And "[e]ven a discretionary act ... will not be protected by official immunity if the conduct is willfully wrong or done with malice or corruption." *Id.*

The official immunity doctrine operates to shield Trooper Lyle from tort liability in this case. Pursuit of a fleeing suspect is recognized as a police officer response to an emergency. *Id.* at 618-19. A police officer's conduct in pursuing a fleeing suspect "involve[s] the kind of discretionary decisions that require professional expertise and judgment that the official immunity doctrine is intended to protect." *Id.* at 619 (citing *Brown v. Tate*, 888 S.W.2d 413, 415 (Mo. App. W.D. 1994)). Throneberry concedes this point, as his response to the Defendants' summary judgment motion admits that Trooper Lyle "considered numerous factors when assessing whether or not to pursue the subject." [L.F. 122] In fact, Throneberry's statement of additional uncontroverted facts cites to MSHP's written policy on vehicular pursuits. The policy requires, among other things, the officer's consideration of "[c]hanging circumstances or conditions" to make a judgment about whether "the risk to public safety associated with continued pursuit [is] greater than the public safety benefit of making an immediate apprehension." [L.F. 180] This is the essence of a discretionary act. *Cf. Ministerial*, BLACK'S LAW DICTIONARY (10th ed. 2014) (defining the term as "of, relating

to, or involving an act that involves obedience to instructions or laws instead of discretion, judgment or skill"). Because Trooper Lyle's decision to commence and continue pursuit of the suspect was a discretionary act, Trooper Lyle "is shielded from [tort] liability in this case by official immunity unless an exception to application of the doctrine applies." *Southers*, 263 S.W.3d at 619.

Throneberry argues in his Reply Brief that Trooper Lyle is not entitled to official immunity because the exception for acting with bad faith or malice applies. *See id.* at 612 (holding that "the doctrine of official immunity will not apply to conduct that is willfully wrong or done with malice or corruption"). "The relevant definition of bad faith or malice [in the context of official immunity] ordinarily contains a requirement of actual intent to cause injury." *State ex rel. Twiehaus v. Adolf*, 706 S.W.2d 443, 447 (Mo. banc 1986). Because Throneberry's petition "contains no allegation of a malicious motive or purpose or of conscious wrongdoing, it therefore fails to state a claim which is not barred by official immunity." *Id.* Though the Petition does allege recklessness in Count III, it does not allege acts or omissions implicating a malicious motive or purpose, or conscious wrongdoing suggesting an actual intent to cause injury. The mere assertion of recklessness as a separate cause of action from negligence is insufficient to implicate the bad faith exception to application of the official immunity doctrine. *Id.* at 610-11 n.8 (recognizing that some jurisdictions recognize an exception to official immunity for acts of recklessness or gross negligence, but noting that "[o]f course, Missouri does not recognize gross negligence"); *see Fowler v. Phillips*, 504 S.W.3d 107, 110 (Mo. App. E.D. 2016) ("Recklessness is an aggravated form of negligence."). More to the point, none of the controverted or un-

controverted facts framed by the summary judgment pleadings permit an inference of bad faith or malice on Trooper Lyle's part. Simply put, there are no facts alleged "from which it could reasonably be inferred that [Trooper Lyle] acted in bad faith or from an improper or wrongful motive."[1] *Twiehaus*, 706 S.W.2d at 447-48. The doctrine of official immunity shields Trooper Lyle from liability for the tort claims of negligence, negligence *per se*, and recklessness alleged in Counts I, II, and III of the Petition.

The public duty doctrine also shields Trooper Lyle from liability for the claims alleged in Counts I, II, and III of the Petition. The public duty doctrine was embraced by the Missouri Supreme Court in 1970. *Southers*, 263 S.W.3d at 611. "The public duty doctrine states that a public employee is not civilly liable for the breach of a duty owed to the general public, rather than a particular individual." *Id.* "The public duty doctrine is not an affirmative defense, but rather delineates the legal duty the defendant public employee owes the plaintiff." *Id.* at 612. "The applicability of the public duty doctrine negates the duty element required to prove negligence, such that there can be no cause of action for injuries sustained as the result of an alleged breach of a public duty to the community as a whole." *Id.* Application of the public duty doctrine also shields " 'the governmental bod[ies] that employ [the public employees] from liability' " *except* to the extent the Missouri legislature has waived sovereign immunity for a governmental body "for injuries arising out of the negligent operation of motor vehicles of for dangerous conditions of public property." *Id.* at 612-13 (quoting *State ex rel. Howenstine v. Roper*, 155 S.W.3d 747, 755 (Mo. banc 2005)).

"The public duty doctrine does not insulate a public employee from all liability, as he could still be found liable for breach of *ministerial* duties[2] in which an injured party had a 'special, direct, and distinctive interest.' " *Id.* at 611-12 (emphasis added) (quoting *Twiehaus*, 706 S.W.2d at 445). And "just as the doctrine of official immunity will not apply to conduct that is willfully wrong or done with malice or corruption, the public duty doctrine will not apply where defendant public employees act 'in bad faith or with malice.' " *Id.* at 612 (quoting *Jackson v. City of Wentzville*, 844 S.W.2d 585, 588 (Mo. App. E.D. 1993)).

We have already explained that Trooper Lyle's decision to commence and continue pursuit of the suspect was a discretionary act, a fact Throneberry does not contest. Thus, the exception to application of the public duty doctrine for "breach of ministerial duties in which an injured party has a 'special direct, and distinctive interest' " is of no application here. *Id.* at 611-12 (quoting *Twiehaus*, 706 S.W.2d at 445). In any event, our Supreme Court held in *Southers* that the duties owed by a police officer during a police pursuit are "duties owed to the public generally." *Id.*

1. Throneberry does argue that Trooper Lyle's pursuit violated MSHP's vehicular pursuit policy. However, it is irrelevant whether Trooper Lyle's conduct violated MSHP departmental policy. "Public employees' conduct that is contrary to applicable statutes or [departmental] policies can constitute evidence that their conduct was negligent, but that conduct does not remove their negligence from the protections of the official immunity or public immunity doctrines where the provisions at issue indicate no intent to modify or supersede these common law immunity protections." *Southers*, 263 S.W.3d at 617.

2. If the alleged breach involves a discretionary duty, then official immunity operates to shield the public employee from liability, whether the duty is owed to the community as a whole or to a specific plaintiff.

at 620. "[A] public employee is not civilly liable for the breach of a duty owed to the general public....." *Id.* at 611. "Missouri courts recognize a duty owed to an individual that escapes the protections of the public duty doctrine where a plaintiff suffers injuries arising from circumstances peculiar to him as an individual, not merely as part of a certain 'class' of individuals who are foreseeable plaintiffs." *Id.* at 619-20 n.23. As was the case in *Southers*, Throneberry "cannot show a duty interest exists that includes reasonably foreseeable injury to particular, identifiable individuals such that the public duty doctrine should not apply." *Id.*

The only other exception to application of the public duty doctrine is for bad faith or malice. We have already explained that Throneberry neither pleaded facts in his petition nor identified facts in the summary judgment pleadings which would permit an inference that Trooper Lyle acted in bad faith or with malice in making the discretionary decision to commence and continue pursuit of the suspect.

 Throneberry's contention in his second point on appeal that Count III, the recklessness claim against Trooper Lyle, should survive summary judgment because Throneberry's state of mind is a genuine issue of fact in dispute is of no import to our conclusion with respect to application of the public duty doctrine. Because "[r]ecklessness is an aggravated form of negligence ... [t]he first issue to consider in either a claim for negligence or reckless conduct is whether the defendant had a personal duty of care toward the injured party." *Fowler*, 504 S.W.3d at 110. Trooper Lyle owed no personal duty of care to the decedent for any tort, including negligence and recklessness, *unless* he acted in bad faith or with malice, neither of which is

implicated by the controverted or uncontroverted facts framed in the summary judgment pleadings.

The public duty doctrine negates the ability to establish the essential element of duty owed by Trooper Lyle with respect to the tort claims of negligence, negligence *per se*, and recklessness alleged in Counts I, II, and III of the Petition.

Based on application of the official immunity and public duty doctrines, the trial court did not error in entering summary judgment in Trooper Lyle's favor on Counts I, II, and III of the Petition, the only claims asserted against Trooper Lyle. Throneberry's first and second points on appeal are denied to the extent they seek reversal of the entry of summary judgment in favor of Trooper Lyle.

## II. *MSHP was shielded from liability on Throneberry's claims of recklessness and negligent failure to train, instruct, and supervise Trooper Lyle (Counts III and IV of the Petition) by sovereign immunity*

 "[S]overeign immunity is a tort protection for governmental entities...." *Southers*, 263 S.W.3d at 610. The protection is codified by sections 537.600 to 537.650.[3] Section 537.600.1 provides that "sovereign or governmental tort immunity as existed at common law in this state ... shall remain in full force and effect" except as expressly therein waived. Section 537.600.1 waives sovereign immunity "for injuries (1) 'directly resulting from the negligent acts or omissions by public employees arising out of the operation of motor vehicles or motorized vehicles in the course of their employment' and (2) resulting from the dangerous condition of public property." *Southers*, 263 S.W.3d at 609

---

**3.** As the accident resulting in Holtsclaw's death occurred in 2012, we rely on the versions of sections 537.600 to 537.650 in effect at that time.

(quoting section 537.600.1). The second exception is not at issue in this case. The scope of the first exception is at issue in this case.

We have already explained that the doctrine of official immunity does not shield MSHP from liability for any of the claims in the Petition because official immunity does not negate Throneberry's ability to establish that Trooper Lyle committed the torts of negligence and recklessness, and thus that MSHP is liable for Trooper Lyle's acts. *See id.* at 611. And we have explained, because the public duty doctrine negates the ability to establish the essential element of a duty owed by a public employee, the doctrine commensurately shields a governmental entity employer from *respondeat superior* liability **unless** the legislature has waived sovereign immunity for the claim. *Id.* at 612-13. The combined operation of these principles with the intended scope of section 537.600.1 means that the only claims asserted against MSHP which can survive sovereign immunity are claims which fall within the exception for negligent operation of a motor vehicle in the course of Trooper Lyle's employment.

Throneberry argues that all five claims alleged against MSHP in the Petition fall within the sovereign immunity exception for injuries directly resulting from the negligent acts or omissions of a motor vehicle by a public employee within the course of his employment. We agree that Counts I, II, and V of the Petition, which allege negligence, negligence *per se*, and negligence on the theory of *respondeat superior*, fall within the scope of this exception, as they each allege that MSHP is liable for Trooper Lyle's negligent operation of a motor vehicle in the course of his employment. We disagree, however, that Counts III and IV, which allege recklessness and negligent failure to train, instruct, and supervise, fall within this exception.

Throneberry's second point on appeal argues that a cause of action for "recklessness" is distinguishable from a cause of action for negligence, relying on *Hatch v. V.P. Fair Foundation, Inc.*, 990 S.W.2d 126 (Mo. App. E.D. 1999). In *Hatch*, the Eastern District concluded that while "Missouri does not recognize legal degrees of negligence," Missouri nonetheless "recognizes a cause of action for recklessness." *Id.* at 139. "Recklessness is an aggravated form of negligence which differs in quality, rather than in degree, from ordinary lack of care." *Id.* "It is applied to conduct which is negligent, rather than intentional, but which is so far from a proper state of mind that it is treated in many respects as if it were so intended." *Id.* But though "[r]eckless conduct may be negligent in that it is unreasonable ... **it is and must be something more than unreasonable.**" *Nichols v. Bresnahan*, 357 Mo. 1126, 212 S.W.2d 570, 573 (Mo. 1948) (emphasis added). To be reckless, a defendant's conduct "'**must contain a risk of harm to others in excess of that necessary to make the conduct unreasonable and therefore, negligent.**'" *Id.* (quoting 2 Restatement, Torts, p. 1294) (emphasis added). Negligence and recklessness "differ ... in the degree of the actor's mental state." *Id.* An "'actor's ... conduct is in reckless disregard of the safety of another if he intentionally does an act or fails to do and [sic] act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize that the actor's conduct not only creates an unreasonable risk of bodily harm to the other but also involves a high degree of probability that substantial harm would result to him.'" *Id.* (quoting 2 Restatement, Torts, Secs. 500, 501).

We agree with Throneberry that recklessness is a distinct cause of action from negligence. We necessarily conclude, therefore, that a cause of action for "recklessness" is not within the scope of the statutory waiver from sovereign immunity for injuries "directly resulting from the *negligent* acts or omissions of public employees arising out of the operation of motor vehicles or motorized vehicles within the course of their employment." Section 537.600.1 (emphasis added). "Statutory provisions that waive sovereign immunity must be strictly construed." *State ex rel. Cass Med. Ctr. v. Mason*, 796 S.W.2d 621, 623 (Mo. banc 1990). The trial court did not err in granting summary judgment in favor of MSHP on Count III of the Petition.

We reach the same conclusion with respect to Count IV of the Petition, which alleges that MSHP negligently failed to properly train, instruct, or supervise Trooper Lyle. "The statutory waiver of sovereign immunity in section 537.600.1(1) that covers 'operation of a motor vehicle' does not include actions alleging negligence in training or enacting policies that pertain to operation of motor vehicles, and this Court will not extend 'operation of a motor vehicle' to cover directions given to those operating vehicles." *Southers*, 263 S.W.3d at 622 n.25. The trial court did not err in granting summary judgment in favor of MSHP on Count IV of the Petition.

Throneberry's first and second points on appeal are denied to the extent they seek reversal of the grant of summary judgment in favor of MSHP on Counts III and IV of the Petition.

### III. *Summary judgment was properly granted in favor of MSHP on Throneberry's claims of negligence, negligence per se, and negligence on the theory of respondeat superior (Counts I, II, and V of the Petition) because Trooper Lyle's conduct was not the proximate cause of Holtsclaw's death*

Although sovereign immunity does not afford MSHP protection from liability for the negligence claims alleged by Throneberry in Counts I, II, and V of the Petition, MSHP cannot be liable for injuries arising out of Trooper Lyle's operation of his patrol car unless the essential elements of negligence can be established.[4]

" 'In any action for negligence, the plaintiff must establish that (1) the defendant had a duty to the plaintiff; (2) the defendant failed to perform that duty; and (3) the defendant's breach was the proximate cause of the plaintiff's injury.' " *Parr v. Breeden*, 489 S.W.3d 774, 778 (Mo. banc 2016) (quoting *Martin v. City of Washington*, 848 S.W.2d 487, 493 (Mo. banc 1993)). The trial court concluded that the essential element of proximate cause could not be established in this case because Trooper Lyle's pursuit of the suspect was not the proximate cause of the accident that resulted in Holtsclaw's death.

Throneberry's first point on appeal argues that summary judgment was improper because the undisputed facts in this case establish that Trooper Lyle's pursuit of the suspect was the proximate cause of the accident as a matter of law. We disagree.

Our Supreme Court addressed whether a police officer's alleged negligence in the

---

4. As we have already explained, the public duty doctrine negates the essential element of "duty owed," and thus the ability to establish a cause of action for negligence against a public employee. However, the legislative waiver of sovereign immunity for claims aris-ing out of a public employee's negligent operation of a motor vehicle overrides a governmental employer's ability to rely on the public duty doctrine to disclaim *respondeat superior* liability for such claims. *Southers*, 263 S.W.3d at 612-13.

pursuit of a suspect can be the proximate cause of a collision between the suspect and a third party in *Stanley v. City of Independence*, 995 S.W.2d 485 (Mo. banc 1999). The undisputed facts were as follows: an Independence, Missouri police officer observed a van matching the description of a vehicle used in an armed robbery thirty minutes earlier. *Id.* at 486. The officer, who was driving a marked patrol car, pulled behind the van while it was stopped at a stop light. *Id.* Once the light changed and the van drove through the intersection, the officer activated his emergency lights and siren. *Id.* The van fled, and the officer elected to pursue. *Id.* The van led the officer through a residential neighborhood, eventually reaching an intersection where traffic was at a standstill due to a stoplight. *Id.* The van drove into the oncoming lane of traffic. *Id.* As the van crossed the intersection in the wrong lane of traffic, it collided with the decedents' vehicle as they tried to pull out of the way. *Id.* The pursuit lasted a total of forty-five seconds. *Id.* Throughout the pursuit, the officer was in contact with dispatch. *Id.* The plaintiffs sued the city and the police officer for the wrongful death of the decedents. *Id.* The city and the police officer moved for summary judgment, which the trial court granted. *Id.*

On appeal, the issue was whether the officer's negligence was "the proximate cause of the collision between the van and the decedents' vehicle." *Id.* at 488. "The general test for proximate cause is whether an injury is the natural and probable consequence of the defendant's negligence." *Id.* In determining whether the officer's negligence was the proximate cause of the collision, we look to the particular facts of the case, mindful that "[p]roximate cause cannot be based on pure speculation and conjecture." *Id.*

Using those principles, our Supreme Court determined that the officer's "conduct was not a proximate cause of the collision" so that summary judgment was appropriate. *Id.* The Court explained:

> Here, [the officer's] conduct was not a proximate cause of the collision. The suspects in the van made the initial decision to flee, sped through red lights and in the wrong lane of traffic, and collided with the decedents. Any negligence by [the officer] is connected to the plaintiffs' injury solely through the conduct of the fleeing van. Thus, the only conceivable causal link between the officer's alleged negligence and the collision is the conjectural effect of his pursuit on the pursued vehicle. Shortly after initiating the pursuit, the officer observed, "this guy is going nuts on us." There is nothing other than speculation to reach a conclusion that the officer's conduct was a "cause" of the collision. Put another way, there is no way to tell whether the collision would have been avoided if the officer had abandoned the pursuit after initiating it. Thus, there is no factual basis to support a finding of proximate cause.

*Id.* Because causation was absent, the trial court's entry of summary judgment in favor of the defendants was appropriate. *Id.*

We reached the same conclusion in *Dilley v. Valentine*, where we concluded that an officer's pursuit of a fleeing suspect for less than two minutes at speeds reaching 50-55 miles per hour was not the proximate cause of the suspect's collision with a minivan. 401 S.W.3d 544, 547 (Mo. App. W.D. 2013). There was no physical contact between the officer's patrol car and the suspect's vehicle, and the officer was in contact with dispatch throughout the pursuit. *Id.* In determining whether the trial court correctly entered summary judgment in favor of the officer and the city,

we considered the facts of the pursuit and concluded that "[t]he facts in this case are very similar to those in *Stanley*." *Id.* at 549. We explained:

> Like in *Stanley*, Officer Valentine was pursuing a fleeing suspect. The emergency lights and sirens of his marked police car were activated. The officer's car was not physically involved in the accident; his patrol car was approximately 120 feet behind the fleeing suspect at the time of the accident. The duration and speed of the pursuit in this case were also similar to those in *Stanley*—the pursuit lasted less than 120 seconds and speeds of 50–55 miles an hour were reached.

*Id.* Thus, there was no factual basis to support an essential element of the negligence claim: that the officer's actions were the proximate cause of the accident. *Id.* The officer and the city were entitled to judgment as a matter of law on the negligence claims.[5] *Id.*

The uncontested facts in this case are materially indistinguishable from those in *Stanley* and *Dilley*. Trooper Lyle's pursuit lasted two minutes or less, over two miles. The pursuit reached 91 miles per hour. There was no physical contact between Trooper Lyle's patrol car and the suspect's vehicle. Trooper Lyle's emergency lights and siren were activated. "[T]he only conceivable causal link between [Trooper Lyle's] alleged negligence and the collision is the conjectural effect of [Trooper Lyle's] pursuit on the pursued vehicle." *Stanley*, 995 S.W.2d at 488. As in *Stanley* and *Dilley*, "there is no factual basis to support

a finding of proximate cause." *Id.*; *see also Dilley*, 401 S.W.3d at 549.

Throneberry argues that this case is more like *Moyer v. St. Francois County Sheriff Department*, 449 S.W.3d 415 (Mo. App. E.D. 2014). Throneberry argues that *Moyer* stands for the proposition that a pursuit that is longer in duration, and faster in speed, than those involved in *Stanley* and *Dilley* will support a finding of proximate cause, at least for purposes of surviving a motion for summary judgment. And Throneberry argues that Trooper Lyle's pursuit of the suspect must be combined with Trooper Yoder's pursuits, to yield a combined pursuit of in excess of thirty minutes in duration.

There are several problems with Throneberry's argument. First, *Moyer* does not stand for the proposition Throneberry claims. Second, *Moyer*'s holding (which has not been accurately captured by Throneberry) is impossible to reconcile with *Stanley*. And third, the facts established in the summary judgment record do not, in any event, support the reasonable inference that Trooper Lyle's pursuit and Trooper Yoder's pursuits constituted a continuous pursuit of the suspect for more than thirty minutes.

We begin by addressing the holding in *Moyer*. There, the suspect fled from the scene of a car stop, and a pursuit ensued. *Id.* at 416. The pursuit ended when the fleeing suspect struck a vehicle operated by the plaintiffs. *Id.* The record was contested, but it supported an inference that the pursuit "lasted up to ten miles and several minutes at speeds approaching 120

---

5. *Dilley* did remand for further consideration of that plaintiff's recklessness cause of action. 401 S.W.3d at 550–51. It did so, however, because the summary judgment pleadings had not argued about the legal basis for expanding the holding in *Stanley* to claims of recklessness. *Id.* at 551. *Dilley* did not address

application of the official immunity or public duty doctrines to shield the officer from the recklessness claim asserted, and did not address application of sovereign immunity to shield the governmental entity employer from the recklessness claim.

miles per hour." *Id.* at 418. The Eastern District concluded that it was error to grant summary judgment based on an inability to establish proximate cause as a matter of law. *Id.*

Throneberry argues that *Moyer* reached this conclusion because the speed, duration, and distance of its pursuit was materially longer and faster than the pursuits in *Stanley* and *Dilley*. We disagree. *Moyer* did not so hold. Instead, the Eastern District explained:

> Although one would have to speculate that an officer's termination of a pursuit would cause a fleeing suspect to cease driving recklessly within a short period of time and distance, as was the case in *Stanley* and *Dilley*, common sense supports an inference that, *as the time and distance between an officer and a fleeing suspect grows, the more likely it becomes that the suspect will cease fleeing in a reckless manner. Stated another way, at some point following an officer's termination of his or her pursuit of a suspect, a fleeing suspect will no longer feel it is necessary to continue driving recklessly to evade capture.* For purposes of this opinion, it is unnecessary to determine the exact circumstances necessary to support a reasonable inference that a fleeing suspect would cease fleeing in a reckless manner following an officer's termination of pursuit. It is sufficient to conclude that the circumstances in this case, viewed in the light most favorable to Plaintiffs, support a reasonable inference that the suspect would have ceased driving in a reckless manner and would have avoided the collision with Plaintiffs had the deputy abandoned the pursuit.

*Id.* (emphasis added).

*Moyer* did not hold that the speed, duration, or distance of a pursuit can reach a point where it is no longer speculative or conjectural to conclude that a decision to continue the pursuit proximately caused an accident. *Moyer* held that it is not speculative to assume that at some point after a pursuit is abandoned, a fleeing suspect will stop driving recklessly. 449 S.W.3d at 418. As the dissent in *Moyer* points out, however, this assumption is itself "rank conjecture and speculation." *Id.* at 420 (Ahrens, J. dissenting). More to the point, the assumption that a suspect will eventually stop fleeing if a pursuit is abandoned applies to *every* pursuit, regardless its speed, duration, or distance. Applied literally, *Moyer* emasculates the holding in *Stanley*, as every police pursuit would be subject to the claim that had the pursuit been abandoned, the fleeing suspect would eventually have stopped driving recklessly. This "assumption," characterized by *Moyer* as "common sense," is in direct opposition to *Stanley*'s holding that "the conjectural effect of [a police] pursuit on the pursued vehicle" affords "no way to tell whether [a] collision would have been avoided if [an] officer had abandoned the pursuit after initiating it." 995 S.W.2d at 488.

In an apparent effort to avoid this obvious conflict with *Stanley*, *Moyer* attempted to differentiate its facts. It did so, inaccurately, however, by mischaracterizing the "time and distance" facts involved in *Stanley* and *Dilley*. *Moyer* observed that "one would have to speculate that an officer's termination of a pursuit *would cause a fleeing suspect to cease driving recklessly within a short period of time and distance, as was the case* in *Stanley* and *Dilley*." 449 S.W.3d at 418 (emphasis added). However, in *Stanley* and *Dilley*, the pursuits were not terminated. The fleeing suspects did not cease driving recklessly at all, let alone "within a short period of time and distance." The only discussion in *Stanley* and *Dilley* about the effect of abandonment of a pursuit on the actions of a

fleeing suspect was to note the inherently speculative and conjectural nature of the connection. And on that topic, *Stanley*'s holding is plain. "[T]he only conceivable causal link between the officer's alleged negligence and the collision is the conjectural effect of his pursuit on the pursued vehicle ... There is nothing other than speculation to reach a conclusion that the officer's conduct was a 'cause' of the collision." 995 S.W.2d at 488. This holding is not susceptible to variance based on the speed, distance, or duration of the pursuit.[6] *Moyer* did not, and could not, have held to the contrary. And the proposition for which *Moyer* does stand—that it can be assumed that if a pursuit terminates, at some point a fleeing suspect will stop fleeing—is also not susceptible to variance based on speed, distance, or duration of a pursuit, and in its application to any pursuit, defies the holding in *Stanley*.

We foreshadowed our discomfort with the holding in *Moyer* in *Frazier v. City of Kansas City*, 467 S.W.3d 327 (Mo. App. W.D. 2015). In *Frazier*, uniformed officers approached the suspect while he sat in a stolen truck in a parking lot. *Id.* at 331. Before the officers could reach the suspect, he sped away and then proceeded to drive at a high rate of speed into oncoming traffic on a highway. *Id.* No officers were behind the suspect at that point, but the controlling supervisor gave officers permission to pursue the suspect. *Id.* One officer pursued the suspect on the highway, driving on the

shoulder several hundred feet behind the suspect with the patrol car's emergency lights and sirens activated. *Id.* at 331-32. The suspect continued to drive the wrong way on the highway and the officer continued to pursue the suspect until the suspect crashed into another vehicle. *Id.* at 332. The pursuit lasted approximately 120 seconds from the time the officer saw the suspect's truck to the time the suspect crashed. *Id.* at 335. A passenger of the car that was struck by the suspect filed suit against the pursuing officer, the city, and individual members of the board of police commissioners. *Id.* at 332. The trial court entered summary judgment in favor of the defendants on the counts of negligence and negligence *per se*. *Id.*

On appeal, the issue was whether there was a factual basis to determine that the officer's pursuit of the suspect was the proximate cause of the accident that injured the plaintiff. *Id.* at 333. After discussing *Stanley*, *Dilley*, and *Moyer*, we summarized and applied those decisions as follows:

> The only distinguishing facts are the differing durations of the pursuits in each case. In *Stanley*, the pursuit lasted 45 seconds; in *Dilley*, the pursuit lasted approximately 120 seconds; in *Moyer*, where the distance traveled was as long as ten miles at speeds up to 120 miles per hour, the pursuit lasted approximately 300 seconds; and here, as in *Dilley*, [the officer's] pursuit of Frazier

**6.** Though *Stanley* did note that its holding was limited to its particular facts, *Stanley* did not hold, and cannot be fairly read to suggest, that the speed, distance, or duration are of a pursuit are variable facts that can overcome the speculative and conjectural relationship between a pursuit and a collision between a fleeing suspect and a third party. 995 S.W.2d at 488. Rather, *Stanley* was referring to facts other than the speed, duration, or distance of a pursuit which could influence the proximate

cause analysis, as indicated by its citation to cases where the alleged negligence of a police officer could be found to be the proximate cause of an accident between a fleeing suspect and a third party. *Id.* (citing, *e.g.*, *Cannada v. Moore*, 578 S.W.2d 597 (Mo. banc 1979) (where police officer was not pursuing a fleeing suspect, but instead positioned his unmarked vehicle to block part of the highway ahead, without warning nearby vehicles)).

lasted 120 seconds. The *Moyer* court reasoned that, unlike cases that involve a shorter pursuit such as *Stanley* and *Dilley*, "common sense supports an inference that, as the time and distance between an officer and a fleeing suspect grows, the more likely it becomes that the suspect will cease fleeing in a reckless manner." *Moyer*, 449 S.W.3d at 418. The *Moyer* court found *Dilley* to be "factually indistinguishable" from *Stanley* but distinguished both from its facts based solely on the length of the pursuit. We, however, find *Dilley* to be on point and not distinguishable from the facts at hand. 401 S.W.3d 544. In sum, we find no distinction in the duration of pursuit, nor in any other significant fact that would make the application of *Dilley* and *Stanley* inappropriate to the facts in the case at bar.

*Id.* at 336. We affirmed the trial court's entry of partial summary judgment. *Id.* at 337-38.[7]

In summary, we reject Throneberry's contention that *Moyer* requires us to conclude that his claims can survive summary judgment on the issue of proximate cause. Even were we inclined to conclude otherwise, which we are not, we would reject Throneberry's claim that the pursuit in this case was more than thirty minutes in duration.

Throneberry's reply brief argues that genuine issues of fact remain in dispute regarding the duration of the pursuit:

> The duration in time of the[ ] pursuits is genuinely disputed by the parties, rendering summary judgment improper. Respondents allege that Trooper Yoder's pursuit lasted for 1 minute and

Respondent Lyle's pursuit lasted for 2 minutes. Appellant believes that the pursuits should be viewed from when the pursuits first began until the pursuits ended, culminating in Appellant's sister's death, therefore lasting 30 minutes. In other words, the history of all three pursuits must be considered as a whole because the pivotal issue in pursuit cases is foreseeability. . . .

. . . .

The length, nature, and history of the pursuits are an issue for a jury to decide.

[Reply Brief, pp. 5-6] (Citation omitted.)

This new argument is not preserved for our review for two reasons. First, it was raised for the first time in Throneberry's reply brief, and varies materially from Throneberry's first point on appeal, where he contends the uncontroverted facts support a finding of proximate cause between Trooper Lyle's pursuit and the accident resulting in Holtsclaw's death. [Appellant's Brief, pp. 10, 19] Second, the argument was never raised with the trial court. [L.F. pp. 118-40; 206-17]

Regardless, even if there is a genuine dispute regarding the duration of the pursuit, that fact is not material on the issue of proximate cause. *Stanley* holds that the speculative and conjectural effect of a police pursuit on a pursued vehicle renders it impossible to know whether a collision would have been avoided had an officer abandoned a pursuit. 995 S.W.2d at 488. The duration of the pursuit is not a variable that influences this holding.

In any event, Throneberry's argument about the duration of the pursuit is not

---

7. We were not dissuaded in our analysis by the fact that plaintiff's expert opined that the officer's violation of departmental procedures and protocols for vehicle chases caused the suspect "to drive in the manner in which he

drove for the entirety of the pursuit until the crash," noting the expert's opinion was itself based on conjecture and speculation. *Frazier*, 467 S.W.3d at 336-37.

supported by the summary judgment record. The uncontroverted facts establish that Trooper Yoder initiated his first pursuit of the suspect at 2:17, and abandoned that pursuit at 2:18. Trooper Yoder's second pursuit of the suspect occurred almost immediately thereafter, and was terminated almost immediately. At 2:46 p.m., Trooper Lyle began his pursuit of the suspect, which lasted two minutes. There are no facts, controverted or otherwise, which suggest that the suspect was being pursued during the approximately twenty-eight minute period between the termination of Trooper Yoder's second pursuit and the initiation of Trooper Lyle's pursuit. Rather, the uncontroverted facts establish that during this period, the suspect stole another car by carjacking someone at gunpoint at a gas station, and then committed an armed home invasion, confronting the homeowner at knifepoint. Though two officers were involved in distinct pursuits, there are no facts supporting an inference that the suspect was being continuously pursued for more than thirty minutes.

Undeterred, Throneberry asserts that because Trooper Lyle knew that Trooper Yoder twice abandoned pursuit of the suspect, Trooper Lyle knew the suspect would have stopped driving erratically had he abandoned the pursuit, supporting the collision that Trooper Lyle's pursuit of the suspect was a proximate cause of the accident which resulted in Holtsclaw's death. We disagree.

First, there is an obvious inconsistency between this contention, and Throneberry's separate contention that pursuit of the suspect was continuous for more than thirty minutes. A continuous pursuit is mutually exclusive of claimed knowledge about the effect of an abandoned pursuit.

Second, Throneberry has not identified any fact in the summary judgment pleadings which would support an inference that Trooper Lyle knew how the suspect reacted when Trooper Yoder abandoned his pursuits. Though the uncontroverted facts establish that Trooper Lyle "knew when he began his pursuit of the suspect that Trooper Yoder had earlier been pursuing the same individual, although the suspect had been driving a different vehicle," and that Trooper Lyle "knew prior to initiating his own pursuit of the suspect that Trooper Yoder had terminated his pursuit," there are no facts in the summary judgment pleadings suggesting that Trooper Lyle had any knowledge about what the suspect's vehicle was doing during or after Trooper Yoder's pursuits.[8] And we are not persuaded that such facts, even if alleged, would have impacted the proximate cause analysis in this case. The uncontroverted facts indicate that the suspect was driving recklessly *before* pursuits commenced, and thus, necessarily, independent of any pursuit. Before Trooper Yoder even made visual contact with the suspect, he was advised by dispatch of "a reported careless and imprudent driver, who was driving a maroon sport utility vehicle, on southbound Interstate 29 at the 34 mile marker." [L.F. 176] Just before Trooper Yoder initiated his first pursuit, he observed the suspect traveling southbound at a high

---

8. We express no opinion on the impact of an officer's knowledge of the effect of earlier abandonment of a pursuit with respect to the proximate cause analysis. To entertain the legal significance, if any, of Trooper Lyle's knowledge of the effect of abandonment of prior pursuits would require us to consider a theoretical argument as neither the controverted or uncontroverted facts address that subject. "An appellate court is neither a law school nor a debating society, and must avoid the theoretical statements of law upon a statement of facts which might never be developed." *Engleman v. City of Dearborn*, 544 S.W.2d 265, 268 (Mo. App. 1976).

rate of speed and passing vehicles on the right shoulder. [L.F. 171] And before Trooper Lyle commenced his pursuit, he was stationary at the intersection of 45 Highway and a private drive, and observed that as the suspect "turned on to Missouri 45 to go north [from a private drive], he accelerated rapidly." [L.F. 93]

We conclude that *Stanley*, *Dilley*, and *Frazier* control the resolution of this issue on the issue of proximate cause. There is no genuine issue of fact in dispute preventing the entry of judgment as a matter of law in favor of MSHP on Counts I, II, and V of Throneberry's petition because the essential element of proximate cause cannot be established.[9] Throneberry's first point on appeal is denied to the extent it seeks reversal of the grant of summary judgment in favor of the Defendants on the issue of proximate cause.

### Conclusion

The trial court's judgment entering summary judgment in favor of the Defendants on all claims asserted in Throneberry's Petition is affirmed.

All concur

---

9. This conclusion would also support the entry of summary judgment in favor of Trooper Lyle and MSHP on all counts in the petition, though we have already affirmed the entry of summary judgment on Counts I, II, and III in favor of Trooper Lyle on the basis of official immunity and the public duty doctrine, and on Counts III and IV in favor of MSHP on the basis of sovereign immunity.